67 311
68 236
67 311
71 143
67 311
76 186
76 492

## PLYMOUTH CORDAGE COMPANY v. F. A. SEYMOUR and Others.[1]

### January 27, 1897.

### Nos. 10.345—(281).

**Corporations—Insolvency—Preferred Claims—Right to Collaterals.**

Corporations A. and B., each a creditor of D., a third corporation, whose respective claims were due, agreed that, if B. would extend the time of the payment of its claim, it should under all circumstances be preferred, and paid its claim in full, before any payment should be made or demanded on the claim of A. The contract was made at the solicitation of D., and for its benefit. B., at the request of D., extended the time of payment of its claim, pursuant to the contract. Afterwards a receiver was appointed of the property of D. under the insolvency laws of this state. A. and B. proved their respective claims. *Held*, that B. is equitably entitled to be paid the dividends on A.'s claim until B.'s claim is paid in full, but that B. is not entitled to have paid to it the proceeds of certain notes, collateral. transferred to A. before the contract was made.

**Same—Dividends.**

Upon the findings of fact herein, *held* that B.'s equitable right to such dividends is superior to any claim thereto of any of the trustees or receivers defendant.

Appeal by defendants Walter A. Wood Mowing & Reaping Machine Company and Van Santvoord and another, its receivers, and Cheney and another, trustees, from an order of the district court for Ramsey county, Brill, J., denying a motion for a new trial. Modified.

[1] Reported in 69 N. W. 1079.

*Young & Lightner*, for appellants.
*Ripley & Brennan*, for respondent.

START, C. J.    The solution of the questions raised by this appeal depends upon the construction to be given to the contract designated as "Exhibit A" in the record.    This contract relates to the affairs of the plaintiff, the Plymouth Cordage Company, a Massachusetts corporation, (hereinafter referred to as the "Cordage Company,") the Walter A. Wood Mowing & Reaping Machine Company, a New York corporation, (hereinafter called the "New York Company,") and the Walter A. Wood Harvester Company, a Minnesota corporation, having its principal place of business at St. Paul, and hereinafter styled the "St. Paul Company."

On March 21, 1894, the New York Company, as the party of the first part, and the Cordage Company, as the party of the second part, duly executed the contract here in question, at the solicitation and with the knowledge of the St. Paul Company.    It is admitted that the recitals in the contract are all true.    The contract first recites that the St. Paul Company is indebted on demand notes to the party of the first part in the sum of $339,000, and that it is also indebted to the party of the second part on open account, which is due, in the sum of $489,390, and that the St. Paul Company would be greatly embarrassed if immediate payment of such indebtedness was demanded by the respective parties, and it desired an extension of the time of payment of such indebtedness by each of the parties, to the end that it might continue its business profitably, and realize upon its assets to the best advantage without loss.    The balance of the contract is in these words:

"The first party is the owner of a very large amount of the capital stock of the said Walter A. Wood Harvester Company, and has confidence in the ability of said Harvester Company to pay its indebtedness in full, if granted additional time therefor, and has expressed to the second party its willingness, not only to extend the time for payment of said Harvester Company's indebtedness to the first party hereto, but also to consent that, under all circumstances, the indebtedness of the said Harvester Company to the second party shall be paid in full, before any payment shall be made on account of said Harvester Company's said indebtedness to the first party:

"Now, in consideration of the premises, and of said second party's extending the time of payment of said Harvester Company's indebt-

edness to it, at the request of the first party, it is agreed between the parties hereto and the said Walter A. Wood Mowing & Reaping Machine Company, for itself, agrees that, under all circumstances, the present indebtedness, and every part thereof, including interest, of the said Walter A. Wood Harvester Company to said Plymouth Cordage Company shall be preferred to, and shall be paid in full, before any payment shall be due and demanded on account of the aforesaid indebtedness of said Walter A. Wood Harvester Company to said Walter A. Wood Mowing & Reaping Machine Company; it being the understanding between the parties hereto, and the intent of this instrument, that the aforesaid indebtedness of said Harvester Company to said Plymouth Cordage Company shall be paid and discharged in full, before any payment whatever shall be made or demanded on account of said existing indebtedness of said Walter A. Wood Harvester Company to said Walter A. Wood Mowing & Reaping Machine Company."

At the time this contract was made the New York Company was, and ever since has been, the owner of a majority of the stock of the St. Paul Company, and it then held, as security for the payment of its debt against the latter, collateral bills receivable, being farmers' notes, transferred to the New York Company by the St. Paul Company for that purpose, to the amount of more than $400,000. The Cordage Company had no security for its debt, and it extended the time of the payment thereof at the request of the St. Paul Company, as agreed in Exhibit A. After the execution of the contract the New York Company, to enable the St. Paul Company to continue its business, surrendered to it all of the $400,000 of collateral notes except $109,000 thereof, and its original debt of $339,000 and interest remained unpaid on March 18, 1895, on which date the defendants Seymour and others were appointed by the district court of Ramsey county receivers of the property of the St. Paul Company in insolvency proceedings. The Cordage Company's original debt of $489,-390 was reduced by payments made by the St. Paul Company, so that, at the time the receivers were appointed, it amounted to $73,-466. Both companies made proof of their respective claims in the insolvency proceedings, and they were allowed.

On February 9, 1895, the New York Company, to secure a loan then made to it, pledged $300,000 of its indebtedness of $339,000 against the St. Paul Company, evidenced by demand notes, with a proportionate amount of the $109,000 collaterals remaining in its hands, to the defendant trustees, Cheney and Geer. The pledge of the collat-

erals was authorized by the St. Paul Company. Shortly after the receivers of the St. Paul Company were appointed an arrangement was made between them and the New York Company whereby the latter turned over to them $83,000 of the notes collateral held by it and the trustees, for collection and remittance. A portion thereof was so collected and remitted by the receivers before the commencement of this action. In December, 1895, the defendants Van Santvoord and Geer were appointed by the supreme court of New York receivers of the property of the New York Company in proceedings for its dissolution as an insolvent corporation.

The Cordage Company brought this action to restrain the receivers of the St. Paul Company from paying to any other of the defendants any dividends upon the claim allowed to the New York Company, or any money in the receivers' hands collected on the collateral notes in their hands, and to require them to pay to the Cordage Company all such dividends and money until its claim against the St. Paul Company is paid in full. The trial court directed judgment for the plaintiff for such relief, and the defendants the trustees, the New York Company, and its receivers appealed from an order denying their motion for a new trial.

The meaning of Exhibit A lies upon the surface. Its language is plain and unambiguous, and clearly expresses the intention of the parties. It speaks from its date, and does not purport to modify anything theretofore done or secured by either party with reference to their respective claims against the St. Paul Company. There is not a suggestion in the contract that, as claimed by the plaintiff, the New York Company should surrender its existing securities for the payment of its debt to the St. Paul Company, or that the Cordage Company should have an equitable lien on, or an assignment (equitable or otherwise) of, the New York Company's debt against the St. Paul Company, or of the collateral notes then held by the New York Company. The contract conferred on the Cordage Company no right or equity to the collaterals pledged prior to the execution of the contract. The fact that the New York Company did afterwards surrender a large part of such securities to the St. Paul Company, whereby the Cordage Company was benefited, does not justify the inference that the parties so agreed; for the language of the contract forbids such a construction. Besides, the trial court found

that the collateral notes were so surrendered to enable the St. Paul Company to continue its business.

On the other hand, the claim of the defendants, to the effect that the agreement of the New York Company, as expressed in this contract, is a mere personal covenant, for the breach of which an action for damages is the only remedy, is equally untenable. It is true that a covenant by a debtor to pay his creditor out of a designated fund, of which the debtor retains control, when the same is received by him, is a personal covenant only, and cannot be construed either as an equitable assignment of, or a lien on, the fund. The authorities cited by the defendants fully support this proposition. Rogers v. Hosack, 18 Wend. 319; Christmas v. Russell, 14 Wall. 69. ·

Such, however, is not this case, wherein the covenant is, not to pay out of a particular fund when received, or to pay at all, for that matter, but one as to the priority of the payment of the claims of the respective parties by and out of the assets of their common debtor. To construe this as merely a personal covenant would be contrary to the intention of the parties, expressed in their contract, and inequitable. At the time the contract was made the common debtor was insolvent, within the legal meaning of the term, if not in fact. It then owed the parties to the contract over $800,000, all of which was then past due. The interest of the New York Company, as a large stockholder of the St. Paul Company, in keeping the latter a going concern, was very great,—much greater than that of the Cordage Company. And to secure this result the New York Company induced the Cordage Company to forego its then existing right to enforce its claim by a covenant to the legal effect that the claim of the Cordage Company should, under all circumstances, have priority, and be paid in full from the then and future assets of the common debtor, before anything should be paid to the New York Company on its claim, or any of such assets appropriated to such payment. Relying on this covenant, the Cordage Company performed its part of the contract by extending the time of the payment of its claim against the common debtor, at its request.

Thereupon, in equity, as between these two creditors, the right of priority of payment and preference in the application of the assets of the debtor attached to the claim of the Cordage Company, and the corresponding burden of posteriority attached to the claim of the

New York Company.    This equity was to be recognized and enforced under all circumstances.    Hence, the fact of the insolvency of the St. Paul Company and that of the New York Company does not affect this equity, except that it affords an additional reason why the covenant should not be construed to be personal only, and why the court should enforce the equity so far as practicable.

There is no practical obstacle in the way of enforcing this equity. If there were no other creditors of the St. Paul Company save the parties to this contract, then the net proceeds of the assets of the insolvent would, in the absence of the contract, be distributed pro rata; but, when the contract is brought into the case, the court ordering the dividend will enforce the equity by treating the Cordage Company as a preferred creditor, and the New York Company as a general creditor, because the parties have so agreed.    It would be, not only inequitable to refuse so to give effect to the contract, but a fraud on the Cordage Company, after it had performed on its part, and when it was impossible to restore to it what it parted with, and for the loss of which it could not be compensated in damages.

The fact that these two creditors are not the only ones who have proved their claims against the estate of the St. Paul Company, and are entitled to share in its assets, does not change the rights of the parties, or materially enhance the difficulties of enforcing the Cordage Company's equitable right to priority and preference as to its claim over that of the New York Company.    The amount of the assets of the insolvent, which these two creditors together are entitled to receive and apply in payment of their respective claims in the order provided by their contract, equals the sum of their respective dividends.    When this sum is ascertained and segregated from the fund in the hands of the receivers for distribution, by means of a pro rata dividend on all of the claims proved, the court can distribute the sum so ascertained between these creditors in accordance with their contract, by treating the claim of the Cordage Company as a preferred one, to be paid in full before anything is paid on the claim of the New York Company.    Precisely the same result follows from the direction given by the trial court to the receivers to pay the sum of the dividends of both creditors on their respective claims directly to the Cordage Company until its claim is paid in full.    This method, adopted by the trial court to enforce the con-

tract, avoids all circumlocution. It is simple, just, and sustained by the law of this case, as between the original parties to the contract.

But the defendants urge that the Cordage Company's right to priority ought not to be enforced as against the receivers of the New York Company. The facts were stipulated in this case, and were found by the trial court as agreed upon. It does not appear, from the findings, that the receivers, in their representative capacity, have any equity superior to that of the New York Company.

It is further claimed that the trustees Cheney and Geer, as trustees for certain creditors of the New York Company, occupy the position of bona fide purchasers as to $300,000 of the St. Paul Company's indebtedness to the New York Company, pledged to such trustees, and that their equities are paramount to those of the plaintiff. The indebtedness so pledged was in the form of demand promissory notes, which were past due some 16 months when they were pledged to the trustees. This fact, it is claimed by plaintiff, charged the trustees with notice of the plaintiff's equitable right to priority of payment from the assets of the common debtor.

The mere fact that the notes were past due when they were pledged to the trustees is not, it would seem, sufficient to charge them with notice of the equity of the plaintiff, a third party. The general rule is that a purchaser of past-due commercial paper takes it subject to all equities existing between the parties to the paper, but not to any latent equities in favor of a third party. A purchaser, however, with notice thereof, acquires only the title of his assignor; and the burden rests upon such purchaser to bring himself within the rule in favor of bona fide purchasers. He is bound to deny notice of the prior equity, and prove his want of notice. This fact rests within his own knowledge. Newton v. Newton, 46 Minn. 33, 48 N. W. 450. Want of notice may be inferred from the payment of a valuable consideration where the transaction occurs in the ordinary course of business and is free from suspicious circumstances. But the court or jury are not bound to find want of notice from the mere fact that a valuable consideration was paid, for he who claims the rights of a bona fide purchaser must prove, not only that he paid a valuable consideration, but also that he purchased without notice. Bank of Farmington v. Ellis, 30 Minn. 270, 15 N. W. 243.

There is no finding in this case that the trustees, or the creditors whom they represented, did not have notice of the contract here in question, or any finding from which such want of notice would be necessarily inferred.   Neither is there any direct finding that the creditors represented by the trustees have not been paid in full; but, this aside, the findings of fact, taken as a whole, fail to show that either the trustees or the creditors whom they represent have any right or equity in the premises superior to that possessed by the New York Company.

It follows that so much of the conclusions of law by the trial court as directs the payment of the dividends on the claim of the New York Company to the Cordage Company until its claim is paid in full must be affirmed, and that so much thereof as relates to the payment to the Cordage Company of the proceeds of the collateral notes must be reversed.   No new trial is necessary.

The case must be remanded, with directions to the trial court to modify its conclusions of law so as to direct that the sum of the dividends of the New York Company and the Cordage Company on their respective claims be paid by the receivers to the Cordage Company until its claim is paid in full, and that thereafter the sum of the dividends, if any, on the respective claims, be paid to the New York Company.   So ordered.